**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| DEREK GUBALA, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>CVS HEALTH CORP,<br><br>     Defendant. | Case No. 14-cv-09039<br><br>Hon. Thomas M. Durkin<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Derek Gubala ("Plaintiff"), through his undersigned attorneys, brings this First Amended Class Action Complaint (the "Complaint") against Defendant CVS Health Corporation ("CVS" or "Defendant"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

## I.   NATURE OF THE ACTION

1.  This is a consumer class action brought on behalf of consumers who purchased the dietary supplement CVS Whey Protein Powder (the "Product") from Defendant. Defendant engaged in unfair and/or deceptive business practices by misrepresenting the nature and quality of the Product on the Product label, and was unjustly enriched.

2.  Defendant makes numerous false and misleading claims on the labels of the Product. These false and misleading claims include, but are not limited to, statements regarding protein content in regards to the percent of daily value, sources of the protein content, and levels

of Glutamine and Branched Chain Amino Acids ("BCAAs"), and purported heightened levels of the specific free-form amino acids Glutamine and BCAAs.

3.  These claims are false. Defendant intentionally does not disclose the existence of the ingredients Asparagine and Hydroxyproline – which Defendant uses to manipulate the actual protein content of the Product – on the Product label. Defendant also claims to include free-form Branched Chain Amino Acids ("BCAAs") and L-Glutamine on the Product label, but fails to actually include these ingredients in the Product. Further, Defendant does not comply with Federal and parallel state regulations regarding the testing methodology of its protein content, making the Product's protein content claims false and misleading.

4.  Plaintiff and each of the Class Members accordingly suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth herein, and seek compensatory damages and injunctive relief.

## II.      JURISDICTION AND VENUE

5.  This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(d), Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of States other than Defendants' States of citizenship.

6.  Diversity jurisdiction exists because Plaintiff is a citizen of Illinois and Defendant is a citizen of Delaware and Rhode Island.

7.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; Defendant is a corporation with a registered agent in this District; and because Defendant transacts business and/or has agents within this District.

### III. PARTIES

8.     Plaintiff Derek Gubala is a citizen of Illinois. Gubala purchased the Product for approximately $20.00 in July 2014 from a CVS retail store in Bolingbrook, Illinois.

9.     Defendant, CVS Health Corporation, is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. Defendant is a citizen of the States of Delaware and Rhode Island. Defendant, directly and/or through its subsidiaries, divisions or business units, wholly owned and/or controlled, sells a wide assortment of general merchandise throughout the United States, including diet and nutrition supplements.

### IV. GENERAL ALLEGATIONS

*Overview of Whey Protein and "Protein Spiking"*

10.     Whey is a complete protein source, meaning it contains all the essential amino acids needed to build protein-based compounds such as muscle tissue, skin, fingernails, hair and enzymes. It is especially rich in branded-chain amino acids – leucine, isoleucine, and valine – which are metabolized directly within the muscles (as opposed to being processed in the liver first).

11.     Sales of whey protein products are expected to grow 62% and reach U.S. $7.8 billion by 2018.[1] However, due to the high level of competition in the market and the escalating price of wholesale whey protein, sellers' profit margins are slim.

12.     Defendant designed, manufactured, warranted, advertised and sold the Product throughout the United States, including the state of Illinois, and continues to do so.

13.     To reduce its protein manufacturing costs and enhance the nitrogen content of the Product, Defendant engages in what is commonly referred to as "protein-spiking," "nitrogen-spiking," or "amino-spiking": Defendant adds nitrogen-containing, cheap, and less beneficial

---

[1] http://www.euromonitor.com/sports-nutrition-in-the-us/report (last visited July 15, 2015).

free form amino acids and non-protein ingredients to the Product, including Asparagine, Hydroxyproline, and the non-amino acid compound Creatine Monohydrate.

14.     Because nitrogen is the "tag" used in protein content calculation, the addition of such ingredients is not revealed by protein content testing. In fact, the testing method is neither a direct measure of the actual protein content in the Product, nor a measure of the type of nitrogen-containing compounds in the Product.

15.     Protein-spiking has been condemned by the American Herbal Products Association, which recently issued a standard for manufacturers for measuring the true protein content of their products.[2] In addition, General Nutrition Centers, Inc., one of the largest distributors of whey protein products in the United States, has publicly criticized protein-spiking as having the effect of misleading consumers, who are unaware of the actual protein content of the spiked products they purchase.[3]

16.     Not only has the American Herbal Products Association and GNC condemned this deceptive practice, but the United States Food and Drug Administration ("FDA") has done so as well:

> FDA requires that dietary supplements be labeled in a manner that is truthful and not misleading. With regard to the labeling of protein content, FDA's expectation for proper nutrition labeling is that firms will evaluate the protein content from actual protein sources—not other nitrogen-containing ingredients such as individual amino acids—and label the products consistent with the results of such evaluations," said FDA press officer Jennifer Dooren.

***

[2] The standard (1) defines protein as a "chain of amino acids connected by peptide bonds," and provides for the exclusion of non-protein nitrogen-containing substances for protein-content calculation and labeling purposes. www.apha.org/default.aspx?tabid=441 (last visited July 15, 2015). The National Academy of Sciences similarly defines protein as macromolecules with links of amino acids; excluded from the definition are free form amino acids and creatine.
[3] www.gnclivewell.com/realprotein (last visited July 15, 2015).

> The FDA says actual protein is what counts, and loading up on nitrogen-rich ingredients to inflate protein claims doesn't meet their standards.[4]

17.     The Food, Drug and Cosmetic Act ("FDCA") also represents that free-form amino acids are simply not protein. Under 21 CFR 101.36(b)(2)(i), a manufacturer is restricted from claiming a product has any protein content if the product only contains amino acids.

18.     Also, the FDCA requires a more sophisticated form of protein testing for products that state the % Daily Value of protein. This testing methodology is called the Protein Digestibility Amino Acid Corrected Score ("PDCAAS"), which measures the actual **quality** of the protein contained in the product.

19.     The protein digestibility–corrected amino acid score (PDCAAS) has been adopted by FAO/WHO as the preferred method for the measurement of the protein value in human nutrition, and directly referenced in the FDCA.

20.     The PDCCAS calculation referenced under the FDCA is:

$$PDCAAS(\%) = \frac{mg\ of\ limiting\ amino\ acid\ in\ 1\ g\ of\ test\ protein}{mg\ of\ same\ amino\ acid\ in\ 1\ g\ of\ reference\ protein} \times fecal\ true\ digestibility\ (\%) \times 100$$

21.     The PDCAAS method does not simply calculate protein by nitrogen, as Defendant would like, but rather by this equation, which requires the manufacturer to determine the amount of Essential Amino Acids, contained within the product.

22.     This testing method ensures that consumers are being informed about the "quality" of the protein that a product actually has.

---

[4]http://www.forbes.com/sites/alexmorrell/2015/03/12/lawsuits-say-protein-powders-lack-protein-ripping-off-athletes/ (last visited July 15, 2015).

23.     Industry leaders, the FDA, FDCA, and actual scientific fact are consistent in acknowledging and establishing that the free-form amino acids and Creatine Monohydrate that Defendant adds to its Products are simply *not* protein.

24.     Despite knowledge that protein spiking is misleading to consumers, Defendant continues to advertise, distribute, label, manufacture, market, and sell the Product in a misleading and deceptive manner in order to increase its sales and maximize its profits.

25.     Several studies show that because free-form amino acids are not absorbed as effectively as whole protein, they do not provide the same beneficial effects as whole protein.[5]

26.     Thus, Defendant's consumers pay an inflated price for the Product, which delivers less actual protein than they reasonably expect.

***Undisclosed Free-Form Amino Acids Used as "Spiking Agents"***

27.     In addition to the foregoing, Defendant's "spiking" tactics also include the non-disclosure of "spiking" agents on the Product label.

28.     Federal statutes and regulations require that all ingredients added to a food product for their functional effect to be listed in descending order of predominance. *See* 21 U.S.C. § 343(i); 21 C.F.R. §§ 101.2, 101.4, 101.100(a)(3)(ii)(c). Failure to list an ingredient, or listing ingredients which are not contained in a product, shall render a food misbranded and therefore its sale will be deemed unlawful. 21 U.S.C. §§ 343(a), 331(a).

29.     Defendant unlawfully adds the free-form amino acids Asparagine and Hydroxyproline, without listing them on the Product label. **Exhibit A.**

---

[5] Di Pasquale MG. Amino Acids and Proteins for the Athlete: The Anabolic Edge, Second Edition. Boca Raton, FL: CRC Press; 2008:190; Katsanos C, et al. Whey protein ingestion in elderly results in greater muscle protein accrual than ingestion of its constituent essential amino acid content. Nutr. Res. Oct. 2008; 28(10):651-658; Magne H, et al. Contrarily to whey and high protein diets, dietary free leucine supplementation cannot reverse the lack of recovery of muscle mass after prolonged immobilization during ageing. J. Physiol. Apr 15, 2012; 590(Pt 8): 2035-2049; Terada T, Inui K. Peptide transporters: structure, function, regulation and application for drug delivery. Curr Drug Metab. 2004;5:85-94.

30.     The addition of these free-form amino acids is used to increase the protein content, "high-quality" protein content and % Daily Value of protein contained within the Product.

***False Claims Regarding the Inclusion of Branched***
***Chained Amino Acids ("BCAAs") and Glutamine in the Product***

31.     What is more, Defendants also claim heightened levels of the specific free-form amino acids Glutamine, and the BCAAs L-Leucine, L-Isoleucine and L-Valine.

32.     BCAAs and Glutamine are sought after ingredients in the dietary supplement industry – so much so that BCAA and Glutamine products are sold as stand-alone items in the retail marketplace.

33.     Defendant's Product label lists BCAAs and Glutamine as part of its "Protein-Amino Acid Blend":



34. However, Defendant's Product does not contain any free-form BCAAs or Glutamine. **Exhibit A.**

35.     Federal statutes and regulations require that all ingredients added to a food product for their functional effect be listed in descending order of predominance. *See* 21 U.S.C. § 343(i); 21 C.F.R. §§ 101.2, 101.4, 101.100(a)(3)(ii)(c). Failure to list an ingredient, or listing ingredients which are not contained in a product, shall render a food misbranded and therefore its sale will be deemed unlawful. 21 U.S.C. §§ 343(a), 331(a).

36.     Dietary supplements must be labeled as such, but Defendant does not label the Product as a dietary supplement.   "You must identify a dietary supplement by use of the term "dietary supplement" as part of the statement of identity, except that you may delete the word "dietary" and replace it with the name of the dietary ingredient(s) in the product (e.g., calcium supplement) or an appropriately descriptive term indicating the type of dietary ingredient(s) in your dietary supplement product (e.g., herbal supplement with vitamins)." 21 CFR 101.3(g).

37.     Further, the Product has a "Nutrition Facts" panel, not a "Supplement Facts" panel.  "One way to distinguish dietary supplements from conventional foods is by looking at the nutrition information on the label of the product. Conventional foods must have a 'Nutrition Facts' panel on their labels, but dietary supplements must have a 'Supplement Facts' panel."[6]

38.     Because the Product is a food, it must comply with 21 CFR 172.320- Special Dietary and Nutritional Additives- Amino Acids.

39.     Defendant adds Asparagine and Hydroxyproline into the Product for the sole purpose of "protein spiking," not "used or intended for use to significantly improve the biological quality of the total protein in a food containing naturally occurring primarily intact protein that is considered a significant dietary protein source…" 21 CFR 172.320(c).  Asparagine and Hydroxyproline are not Essential Amino Acids which need to be added to the diet, and thus do not improve the biological quality of the protein product.

---

[6] http://www.fda.gov/AboutFDA/Transparency/Basics/ucm194357.htm (last visited July 16, 2015).

40.     The Product does not list the amounts of each of the free form amino acids (BCAAs) it claims to include, in violation of the FDCA.  21 CFR 172.320(e)(2).

**Defendant's False Claims of Protein Content and % Daily Value of Protein Contained in the Product**

41.     "The percent of the DRV is required if a protein claim is made for the product or if the product is represented or purported to be for use by infants or children under 4 years of age. Based on current scientific evidence that protein intake is not a public health concern for adults and children over 4 years of age, and because of the costs associated with a determination of the Protein Digestibility Corrected Amino Acid Score (PDCAAS), FDA has determined that declaration of the percent of the DRV for protein need not be provided when a claim is not made."[7]

42.     The Product does have a protein claim on the label, and therefore is required to have the percent of DRV listed in the Nutrition Facts section.  Defendant lists the product as having 52% DRV for protein.  This is based on the 50g DRV determined by the FDCA and the 26g protein claim on the Product. 21 CFR 101.9(c)(7)(iii).

43.     When protein is listed as a percent of the 50 gram DRV and expressed as % DV, the % DV is calculated by correcting the actual amount of protein in grams per serving by multiplying the amount by its amino acid score corrected for protein digestibility, dividing by 50 grams, and converting to percent. 21 CFR 101.9(c)(7)(ii).  However, Defendant simply used the nitrogen testing with a factor of 6.25 to determine the protein content.  If Defendant made no protein content claim on the label of the Product, and if they did not include the % DV of protein under the Nutrition Facts section, they could legally use this method.  But, Defendant did use

---

[7]

http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm064894.htm#declare (last visited July 16, 2015).

protein claims and did list the % DV, and thus is statutorily obligated under the FDCA to determine the protein content and % DV by PDCAAS, which they did not.

44.     Protein Digestibility Corrected Amino Acid Score (PDCAAS) measures protein quality based on human essential amino acid requirements and our ability to digest it. The test protein is compared to a standard amino acid profile and is given a score from 0-1, with a score of 1.0 indicating maximum amino acid digestibility. Common protein supplements (whey, casein, and soy) all receive 1.0 scores. Meat and soybeans (0.9), vegetables and other legumes (0.7), and whole wheat and peanuts (0.25-0.55) all provide diminished protein digestibility. PDCAAS is currently considered the most reliable score of protein quality for human nutrition.[8]

45.     The protein digestibility-corrected amino acid score shall be determined by methods given in sections 5.4.1, 7.2.1, and 8.00 in "Protein Quality Evaluation, Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation," Rome, 1990. 21 CFR 101.9(c)(7)(ii).

46.     Defendant has failed to comply with the section for PDCAAS and determining the protein content making up the % DV.  They did not test for individual amino acids, and they did not use the proper factors as referred to in the FDCA.  They simply took the nitrogen count and then used the factor for whey protein, thus overstating the % DV.  Therefore, Defendant is in violation of 21 CFR 101.9(c)(7)(ii).

47.     The 26-gram protein claim and the 52% Daily Value claim, provided under the Nutrition Facts panel of the Product, are false and misleading.  Based on the amino acid composition of the Product, and the inclusion of Creatine Monohydrate into the protein content, the protein claim would at most be 21.8 grams.  Exhibit A.

---

[8] https://labdoor.com/article/protein-quality-the-4-most-important-metrics (last visited July 16, 2015).

48.     The individual free-form amino acids and the Creatine Monohydrate would not contribute to the final protein content determined by the FDCA's mandated methodology for determining protein % Daily Value, the PDCAAS.

***The Misleading Claim "26 grams of High Quality Protein per Serving"***

49.     Defendant displays the false and misleading claim, "26 grams of high quality protein per serving" prominently on the front of the Product label:



50.     Because the PDCAAS is used to determine "protein quality," Defendant intentionally miscalculated the PDCAAS for the Product. The claim "26 grams of quality protein" is objectively false because the PDCAAS was not tested for properly by Defendant.

51.     Also, because this is a protein claim, referred to under 21 CFR 101.9(c)(7)(i), and is not based on the PDCAAS, it is false and misleading.

52.     Moreover, the statement "26 grams of high-quality protein per serving," when read in conjunction with other label statements including the Product name "Whey Protein Powder," contributes to the misleading nature of the Product label.

53.     Indeed, the statement "26 grams of high-quality protein per serving" and Product name "Whey Protein Powder" are the only front label statements referencing the Product's "protein," and given that the Product actually contains 21.8 grams of protein based on the analysis explained above, a reasonable consumer reviewing these statements is misled about the quality of the Product.

***The Misleading Product Name***

54.     The Product name "Whey Protein Powder," also referred to in the FDA regulations as the "statement of identity," is prominently stated at the top of the principal display panel (or front label) of the Product. Whey protein is the Product ingredient sought by millions of consumers.

55.     Beneath the Product name appear additional descriptive statements "Vanilla" and "Naturally & Artificially Flavored Drink Mix." While "Vanilla" is arguably also part of the Product name, the statement "Naturally & Artificially Flavored Drink Mix" is not. The statement of identity shall be in bold and prominent print, 21 C.F.R. § 101.13(d), and the statement

-13-

"Naturally & Artificially Flavored Drink Mix" is not prominently displayed in relation to the other front label statements.

56.     Under the applicable FDA regulation, the Product label's statement of identity must be an appropriate descriptive name that is not misleading. 21 C.F.R. § 101.3(b)(3).

57.     Pursuant to 21 C.F.R. § 101.18(b), "The labeling of a food which contains two or more ingredients may be misleading by reason (among other reasons) of the designation of such food in such labeling by a name which includes or suggests the name of one or more but not all such ingredients, even though the names of all such ingredients are stated elsewhere in the labeling."

58.     The Product name "Whey Protein Powder" violates 21 C.F.R. § 101.3(b)(3) because it contributes to the misleading nature of the label along with the other challenged Product label aspects, particularly the statement "26 grams of high-quality protein per serving." It draws consumers' attention away from the significant amounts of spiking ingredients in the Product powder, which are required to be listed on the rear-facing Product label, or "information panel," of the Product.

59.     A reasonable consumer is not expected to consult the ingredient list appearing on the information panel to discover the true nature of the food product. Rather, a reasonable consumer's purchase decision is governed by appearances and general impressions.

60.     Moreover, the statement "Naturally & Artificially Flavored Drink Mix" gives no indication of the substantial amounts of spiking ingredients in the Product. It only indicates that the Product contains added flavors, and that the Product is a "mix" of some sort, without specifying what the Product consists of besides whey protein and added flavoring ingredients.

-14-

61.     The Product name "Whey Protein Powder" also violates 21 C.F.R. § 101.18(b), which prohibits as misleading CVS's use of the name "Whey Protein Powder" to describe a product that has been adulterated with substantial amounts of spiking ingredients, including free form amino acids and non-protein ingredients.

62.     Pursuant to 21 U.S.C. § 321(ff), Defendant's Product is a "food" regulated by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, ("FDCA") and FDCA regulations.

63.     Defendant's false, deceptive and misleading label statements violate 21 U.S.C. § 343(a)(1) and the so-called "little FDCA" statutes adopted by many states,[9] which deem food misbranded when "its labeling is false or misleading in any particular."

64.     Defendant's false, deceptive and misleading label statements are unlawful under State Unfair and Deceptive Acts and Practices Statutes and/or Consumer Protection Acts, which prohibit unfair, deceptive or unconscionable acts in the conduct of trade or commerce.

65.     Illinois has expressly adopted the federal food labeling requirements as its own: "[A] federal regulation automatically adopted pursuant to this Act takes effect in this State on the date it becomes effective as a Federal regulation." 410 ILCS 620/21. Thus, a violation of federal food labeling laws is an independent violation of Illinois law and actionable as such.

66.     Further, as explained above, Defendant's claims are misleading to consumers in violation of 21 U.S.C. § 343, which states, "A food shall be deemed to be misbranded—False or misleading label [i]f its labeling is false or misleading in any particular."

67.     The ILCS incorporates the exact language of the FDCA in 410 ILCS 620/11 by stating, "A food is misbranded- (a) If its labeling is false or misleading in any particular."

---

[9] *See, e.g.*, 410 ILCS 620/11.

-15-

68.     Also, the ICFA provides protection for consumers when purchasing products, including Defendant's Product, by stating, "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact…" 815 ILCS 505/2.

69.     The introduction of misbranded food into interstate commerce is prohibited under the FDCA and all state parallel statutes cited in this Class Action Complaint.

70.     Defendant intended for Plaintiff and the class members to be misled.

71.     Defendant's misleading and deceptive practices proximately caused harm to the Plaintiff and the Class.

***Plaintiff's claims are not preempted***

72.     Plaintiff seeks to hold CVS accountable for violating 21 U.S.C. § 343(a), which prohibits labeling that is "false or misleading in any particular," and for violating other federal labeling requirements as alleged herein. Section 343(a) is the "catch-all" misbranding provision under federal law, and its distinct function in the statutory framework is to address false or misleading labels when the FDA has not set specific requirements addressing the labels' misleading aspects.[10]

73.     Plaintiff is not seeking to impose any requirement for the labeling of the Product of the type required by the FDCA that is not identical to the requirement of the FDCA. Plaintiff's state law causes of action are based on violations of federal labeling laws.

---

[10] The FDA itself emphasized the importance of § 343(a) in a recent article about protein-spiking, stating "FDA requires that dietary supplements be labeled in a manner that is truthful and not misleading." *See* Alex Morrell, *Lawsuits Say Protein Powders Lack Protein, Ripping Off Athletes*, Forbes (March 12, 2015). The FDA's interpretation of § 343(a) is entitled to deference. *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2575-76 (2011).

74.     Plaintiff does not seek to impose any labeling requirement other than to refrain from misleadingly labeling the Product, and none of the challenged label aspects are required or authorized by the FDA regulations given preemptive effect.

75.     Specifically, remedying the Product label would not require CVS to identify each source of protein in the Product on the label, or to distinguish between the sources of protein in the Product on the label. The misleading nature of the Product label could be remedied in a number of ways not involving the imposition of requirements that are "not identical" to the requirements given preemptive effect. For example, the prominence, positioning, and content of the statements appearing on the front of the label could be altered to achieve a non-misleading label, and in a manner not implicating federal preemption. The jury need only find that the Product label is misleading, and under federal law, CVS is ultimately responsible for curing the misleading aspects of the Product label.

## V.      CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action individually and as representatives of all those similarly situated pursuant to Rule 23 F.R.C.P. on behalf of the below-defined Classes:

> **National Class:** All persons in the United States that purchased the Product.

> **Illinois Subclass:**  All persons in the State of Illinois that purchased the Product.

Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

77. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

78. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, Class members number in the thousands to millions. The precise number of Class members and their addresses are presently unknown to Plaintiff, but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

79. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

a. The true nature of the protein content in the Product;

b. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Product is deceptive;

c. Whether Defendant's actions violate the State consumer fraud statutes invoked below;

d. Whether Defendant was Unjustly Enriched at the expense of the Plaintiff and Class Members; and

e. Whether Defendant violated an Express Warranty to Plaintiff and Class Members.

80. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class members. Similar or

identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

81.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all Class members were comparably injured through Defendant's uniform misconduct described above. Further, there are no defenses available to Defendant that are unique to Plaintiff.

82.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members he seeks to represent, he has retained counsel competent and experienced in complex class action litigation, and he will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and his counsel.

83.    **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

84.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other

members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

85.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court

## VI.     CLAIMS ALLEGED

### COUNT I
### Violation of Illinois Consumer Fraud Act
### 815 ILCS 505/1 *et seq.*
### (On behalf of the Illinois Subclass)

86.     Plaintiff incorporates paragraphs 1-85 as if fully set forth herein.

87.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.* ("ICFA") prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

88.     Defendant intended that the Plaintiff and each of the other members of the Illinois Subclass would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

89.     As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff Porter and each of the other members of the Illinois Subclass have sustained damages in an amount to be proven at trial.

90.     In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT II
**Unjust Enrichment**
**(On Behalf of the National Class)**

91.     Plaintiff incorporates paragraphs 1-85 as if fully set forth herein.

92.     Plaintiff and the other members of the National Class conferred benefits on Defendant by purchasing the Product.

93.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the other members of the National Class' purchase of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Product was misleading to consumers, which caused injuries to Plaintiff and the other members of the National Class because they would have not purchased the Product if the true facts would have been known.

94.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the other members of the National Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the other members of the National Class for their unjust enrichment, as ordered by the Court.

## COUNT III
### Breach of Express Warranty
### (On Behalf of the National Class)

95.     Plaintiff incorporates paragraphs 1-85 as if fully set forth herein.

96.     Plaintiff, and each member of the National Class, formed a contract with Defendant at the time Plaintiff and the other National Class members purchased the Product. The terms of the contract includes the promises and affirmations of fact made by Defendant on the Product's packaging and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of bargain, and are part of the standardized contract between Plaintiff and the members of the National Class and Defendant.

97.     Defendant purports through its advertising, labeling, marketing and packaging to create an express warranty that the Product contained "26 Grams of high quality protein per serving."

98.     Plaintiff and the National Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

99.     Defendant breached express warranties about the Product and its qualities because Defendant's statement about the Product was false and the Product does not conform to Defendant's affirmations and promises described above.

100.     Plaintiff and each of the members of the National Class would not have purchased the Product had they known the true nature of the Product's ingredients and what the Product contained.

101.    As a result of Defendant's breach of warranty, Plaintiff and each of the members of the National Class have been damaged in the amount of the purchase price of the Product and any consequential damages resulting from the purchases.

## VII.    RELIEF SOUGHT

WHEREFORE, Plaintiff and the other Class members respectfully request that the Court:

a.    Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Award damages, including compensatory, exemplary, statutory, incidental, consequential, actual, and punitive damages to Plaintiff and the Class in an amount to be determined at trial;

c.    Award Plaintiff and the Class their expenses and costs of the suit, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees;

d.    Grant restitution to Plaintiff and the Class and require Defendant to disgorge its ill-gotten gains;

e.    Permanently enjoin Defendant from engaging in the unlawful conduct set forth herein;

f.    Grant any and all such other relief as the Court deems appropriate.

g.    Grant any and all such equitable relief as the Court deems appropriate.

h.    Grant any and all damages available under the unfair and deceptive trade practices and consumer protection laws.

## VIII.    JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 16, 2015                       Respectfully submitted,

*/s/ Joseph J. Siprut*
Joseph J. Siprut
*jsiprut@siprut.com*
**SIPRUT PC**
17 N. State Street
Suite 1600
Chicago, Illinois  60602
312.236.0000
Fax: 312.878.1342
www.siprut.com

Nick Suciu III*
*nicksuciu@bmslawyers.com*
**BARBAT, MANSOUR & SUCIU PLLC**
434 West Alexandrine
Suite 101
Detroit, Michigan  48201
313.303.3472

E. Powell Miller, Esq.*
Sharon S. Almonrode, Esq.
E-mail:  ssa@millerlawpc.com
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI  48307
Telephone:  (248) 841-2200

*Counsel for Plaintiff*
*And the Proposed Putative Classes*

*  *Pro Hac Vice*

4833-1548-0869, v. 1

-24-